I'm representing Pamela Chase and Yvonne O'Keefe. Since 1982, it has been clear that an involuntarily committed mental patient has a constitutionally protected interest in the exercise of professional judgment in his care. This case, we believe, presents the closely related contention that where county mental health officers deliberately refuse to exercise professional judgment and thereby do not commit a dangerous mental patient for involuntary care, that they have created a constitutionally dangerous situation. The fact pattern here is regrettable, but we believe that it is related to the fact patterns that have been addressed by this court in applying the same standard of when there's a constitutionally dangerous condition created in a number of cases. The first of those, obviously, would be Wood v. Ostrander in 1989. Then there was the L.W. Grubbs decision in 1992, which we think is a similar factual situation where you have a person who's a known dangerous sex offender, a person working in the governmental facility where that person's being housed. The sex offender is then placed into the work environment of a lone female and does what his case history predicted he would do, which is he commits violent acts against the female individual. In this case, we have a person who, according to the complaint, was identified as one of that small percentage of mental health patients who are so delusional, so unable to control their own view of the world, and that under California's statute for involuntary commitment of Welfare Institutions Code 5150, that the exercise of professional judgment by the county, given the information available to them, required them to commit that individual. Among other things, that commitment would have led to a statutory obligation to remove from that individual firearms and other dangerous weapons under Welfare Institutions Code sections 8100 and 8103. When the county failed to do that, the allegation is that they failed to do it based on a conscious, intentional, deliberate policy that either for financial reasons or some other consideration that weighed more heavily in the county decision-making process than either the treatment of their individual, and instead continued to invite him, month after month after month, back into the workplace at Behavioral Health Services where the plaintiffs were employed. It is that repeated invitation of the known dangerous patient into the workplace which we believe passes the threshold of constitutional dangerousness. Are you suggesting the county should have done nothing with him? Not have a place for him to come for these follow-up treatments? Well, you know, we get into even larger policy issues there about allocation of money and so forth, but we have a statutory scheme in California stated in Welfare Institutions Code to 5600 et sec, stating that there will be community treatment facilities, that every year the county will allocate resources in order to perform appropriate community treatment within the statutory scheme. So we've created a responsibility. The county has accepted the responsibility by creating this clinic. The suggestion really is that they just have to do it right. In a constitutional sense, they wouldn't get liability under due process considerations if the first time the patient came in, they identified, you know, this is one of those patients that's so severely ill that he's dangerous. We don't have the resources to treat him. We'd better just tell him to go away. I mean, that may be appalling in a larger context, but it would, I believe, eliminate their exposure to this kind of constitutional risk of liability. Isn't this something that is traditionally handled under state law? I mean, what is the immunity? What, I mean, what? Certainly aspects are. And in California, the state law arises out of Tarasoff versus University of California Regents and Civil Code 43.92. There is in fact, that was in fact the second claim in this complaint. And that after the dismissal of the federal claim, that claim is currently being litigated in state court. But the standards under Tarasoff and Civil Code 43.92 are substantially different than the standards for municipal liability and the extent of liability under the 42 U.S.C. 1983 Act. And you get more damages under, if it's a constitutional violation? Well, who knows? I mean, you have. You brought it for some reason. I assume it wasn't an accident you found yourself in federal court. Gee, it's a nice building. I'll just go to federal court. The focus of the state tort is on the action of the psychotherapist, the individual psychotherapist. The focus in the 1983 action, as we have framed this particular one, is really on the policy making, the governmental involvement, which may, not as a practical measure, but may theoretically increase the ability to pay damages. But more importantly, it has a salutary effect on the conduct of the government. If one of the reasons for having governmental liability is to try and convince governmental authorities that they should do things that avoid that liability. But we know that, I mean, the Supreme Court has told us clearly that this isn't a worker's compensation law, that you don't have a 1983 violation just because the municipality or the county has provided a workplace that turns out not to be as safe as it could be. So the policy in terms of the beneficial effect of encouraging the government to maintain a safe workplace, that doesn't do it for establishing 1983 liability. Well that's not the analysis for 1983 liability, but I'm asked what's the point? Why do we want to go here? If in fact the policy is as stated in the complaint, we think it should be addressed as a civil rights violation. And I understand this is a motion to dismiss. The policy as I understood it from the complaint is not that the county said that we would not permit or would not launch an involuntary commitment, but that such a proceeding was discouraged. Is that correct? I believe that the complaint indicates, I'd have to refresh my memory to be positive, but I believe it indicates that in fact he was evaluated for such a commitment and they refused to do it. That was in reality the case. Refused to do it by something other than a professional judgment of a psychiatrist or psychologist? Correct. The psychiatrist and other professionals were involved. They chose not to commit him, not because that was an exercise of professional judgment, but because of this other policy which did not take into consideration professional judgment. Presumably, one of the things that kind of mystified me about this is the other county officials including the doctor, names his defendant, presumably they're putting themselves in the line of fire as much as anybody else. I mean, they're going to continue to deal with this person. Are you saying they've decided, well, it's going to be unsafe for me to be here, but as a matter of policy we're not going to do anything to commit him? Well, thinking through the consequences of one's actions is not always the way things are handled, even in a governmental decision-making process. In this particular case, the way this potential danger became real with this individual patient was that he started at the front of the behavioral health services offices shooting dead the receptionist and walking back through the office shooting everybody he saw until he got to the door of the psychiatrist who was, in fact, on the other side of the door hoping that the lock would not be broken. So in fact, it may have been that the psychiatrist, by following the policy, did place himself at substantial risk in this individual case. But, again, that's not really the issue for the 12 v. 6. You have about a minute left, Your Honor. Good morning, Your Honors. I represent my name is Martha Springer. I represent Nevada Health Services in January 10, 2001, was indeed tragic. But we've been instructed by the Supreme Court and a number of circuits that we can't look in hindsight, we can't look at the consequences of that event. We have to look at the conduct which initiated it. The harm was inflicted by Scott Thorpe and by Scott Thorpe alone. The county and the individual appellees did not furnish him with his gun and they did not furnish him with the bullets that he used to shoot. According to the complaint, Mr. Thorpe was last seen at the county in July of 2000. The complaint does not talk about repeated invitations back to behavioral health services into this workplace. So that is not in the record. The focus on the liability for a constitutional violation for the appellees, again, has to be on not the consequences, but the level of the conduct. If the focus were on the consequences of the conduct, then virtually every state court tort claim would be transformed into a constitutional violation. The Supreme Court has told us several times that that shouldn't happen. What the appellants, again, are trying to do is take a state court claim, which they are pursuing in state court, and turn it into a federal claim that they can pursue here. That can't happen in this case because there has been no state-created danger. That is the sole question for decision, according to the appellant. What Nevada County and the other appellees arguably did was fail to do something. They failed to do something they weren't required to do in the first place, which is commit Mr. Thorpe under Health and Welfare Code Section 5150. The appellants have pointed to some supposed policy that the county made to not, for reasons of money, bring people in for an evaluation and commit them. But somewhat inconsistently, the complaint also says they did bring Mr. Thorpe in to evaluate him. In July of 2002, they did spend that money. Yes, they determined that he did not meet the criteria for involuntary hospitalization. At the most, that is a malpractice claim, a negligence claim. But it didn't create any danger to the employees, which would include the very people who are being sued, because it left them in the same position they were before the decision not to commit him was made. It's very similar. This is a 12B6 dismissal. I'm sorry? This is a 12B6 dismissal. Yes, it is. So we have to take the complaint in the light most favorable to the plaintiff. So their complaint here is that they had a policy, and I know you dispute that there is such a policy, but we have to accept that there is a policy not to commit people, even if they're dangerous, for budgetary reasons. Now, accepting that as the premise, and I know you dispute it, but that's what we have on our plate. Tell me why that wouldn't state a constitutional claim, if you're saying, we absolutely have a policy that we're going to put dangerous people back into this environment and require them to go to a state-funded and sponsored facility. First, I just want to reiterate the inconsistency in the complaint, because they say there's this policy, and yet they say that we ignored this policy in this case, and we brought him in. But that's, unfortunately, we're stuck with the complaint and construing. Right. Secondarily, it's, the complaint alleges that it was done as a budgetary issue, as an economic issue. And both the Supreme Court and the circuit courts have indicated that these difficult decisions that local elected officials make, based on social or budgetary or economic reasons, should be left to them and shouldn't be second-guessed by the federal judiciary, who's quite a bit removed from it. So if there was some sort of decision made about limiting 5150 commitments because of budgetary reasons, that's a decision that should be left to the Nevada County officials. That would be my answer. Well, you know, I agree with that as far as it goes. My question is whether the complaint construed most favorably to the plaintiff goes a little bit further than that. For example, one could not constitutionally adopt a policy that said we're not going to pay for, we're not going to pay for counsel in criminal cases. That would be a budgetary decision that would not be held constitutional. And similarly, the fact that you have a budgetary decision doesn't immunize all budgetary decisions. So explain to me why you think this particular policy would not violate the Constitution. I think this policy would not violate the Constitution because it didn't create a dangerous situation. Because it's still, it's not an affirmative act, it's a failure. It's very similar to the Deshaney case, where Winnebago County and its Child Protective Services had the authority under state statutes to take this young boy away from his father. They knew that his father was beating this boy. They had the authority to take him away. There was supposedly a policy of not doing that. They left him there. So they left him in the same position he had been in had they not removed him. That's what's happened here. Even if there is this policy that exists for an economic reason, it didn't change the position in this particular case. Mr. Thorpe, he was a free man when he came in in July of 2002. He wasn't forced into a hospital. He walked out and he remained a free man after that decision. And everyone else was in exactly the same position in relationship to him. So what I'm saying is even if this policy exists, it didn't change the position in this particular case. The appellants have used all the correct buzzwords. They've used the callous indifference, the wanton indifference, the reckless indifference. But it doesn't, in addition to not having a state-created danger issue, we also have to look at the level of culpability that kind of thing. In this county of Sacramento v. Lewis and the Ulrich decision, which was cited by the second Grubbs case, which is the Ninth Circuit case, the level of recklessness or deliberate indifference has to be tantamount to an intent to injure. There's no allegation in this complaint that the county of Nevada or the individual appellee has had any intent to injure Ms. Chase or Ms. O'Keefe. I suppose that if there had been a policy here saying we're going to shut down the Behavioral Center and all the employees are going to have to go out and visit the patients at their home for economy reasons, that that might be an affirmative putting someone in danger that might qualify for as a process. Yes. And I agree with that. And I was trying to think of some situation that would perhaps fit. And I was looking at the Ulrich case where they did close down a center for a holding place for the criminally insane and put these people back into the general environment, so to speak. If the county had said to Ms. Chase, you seem to be the object of Mr. Thorpe's delusions, so take Mr. Thorpe outside, meet with him and deal with him and left her alone with him, that could possibly be a constitutional violation. But that isn't what happened in this case. I also raised the issue of qualified immunity. I know that it hadn't been reached below, so I'll leave that up. Thank you. Very briefly, at Bates page 4 of the excerpt of record, paragraph 23 of the complaint, it does indicate that there was an evaluation done for 5150, but they did not order 5150. Paragraph 26 in Bates Stamp, page 5 of the record, indicates that it was for an appointment that the shooting and killing and everything occurred, so I think the fair inference is that he was being invited back into the workspace in that dangerous condition. Then at Bates Stamp, page 36, excuse me, 6, paragraph 36, the first of two of that number, I'm afraid, it does state that the policy is in violation of the laws and policies of California and the professional standards of mental health treatment. So the complaint, I think, fairly construed, appropriately construed for this purpose, does state that it's the violation of professional judgment which has been recognized as a potentially constitutionally significant violation. That is the starting point for analysis. Thank you. Thank you, counsel. Bates just argued is submitted for decision. We'll hear the next case, which is Dan Drycreek, Rancheria Band, Indians. Good morning, Your Honors. Dan Drycreek.
judges: Schroeder, Thomas, Clifton